# Robinson *versus* The Pittsburgh and Connellsville Railroad Company.

It is no defence to an action to recover the amount of a subscription to the capital stock of a railroad company, that it was made at the request of the president of the company, with the understanding that the defendant was not to pay for or hold the stock subscribed, and that the same was to be cancelled.

Such an agreement would be a fraud on the company, and on all subsequent subscribers; and whilst the defendant might reap no advantage from it, he would be held to all the responsibilities of a *bonâ fide* subscriber.

In the absence of proof as to the time when a memorandum was added to the formal subscription, the presumption would be that it was there when the subscription was made.

ERROR to the District Court of *Allegheny county*.

[Robinson *v.* The Pittsburgh and Connellsville Railroad Company.]

This was an action of *assumpsit* by The Pittsburgh and Connellsville Railroad Company, against William Robinson, Jr., to recover $5000, for 100 shares of the stock of the said company, subscribed for by the defendant on the 17th February 1853.

The facts of the case are sufficiently stated in the charge of the court below, which was delivered by WILLIAMS, J.:—

"This is an action to recover the unpaid instalments alleged to be due on one hundred shares of the capital stock of the Pittsburgh and Connellsville Railroad Company, subscribed for by the defendant on the 17th of February 1853. The plaintiffs having given in evidence their charter, the defendant's subscription, the calls for the instalments, and the notice of the treasurer, are entitled to recover unless the defendant has shown that he has a good and valid defence to the action.

"The defendant contends that he is not liable for the unpaid instalments in question, because the subscription was made by him at the request of William Larimer, Jr., the president of the company, with the express understanding that he was not either to pay for or hold the stock for which he subscribed, and that the same was to be cancelled. In support of this position, he has given in evidence the certificate of William Larimer, Jr., verified by affidavit, showing the fact to be as alleged. This evidence is objected to as incompetent, on the ground that it tends to contradict the contract or agreement of subscription given in evidence by the plaintiff. It seems to me that the objection to the evidence is well founded. No principle of law is better settled than that parol evidence is inadmissible to contradict, vary, or change the terms of a written contract, where there is neither fraud nor mistake in the transaction. This evidence does tend directly and positively to contradict the terms of the contract of subscription, and must therefore be disregarded by the jury. It is not pretended, that any fraud was practised on the defendant to induce him to make the subscription. He must have known, when he made the subscription, that he was thereby rendering himself liable to the company for the amount of the stock for which he subscribed; and if it was the understanding that he should neither pay for the stock nor hold it, but that the same should be cancelled, it is his misfortune that he did not have the stock transferred to the company or his subscription cancelled during the presidency of Larimer; or that he did not require of Larimer satisfactory indemnity against any demands of the company on account of the subscription, before making the same. If he made the subscription, on the faith of the pledge or assurance of Larimer that he should not be called on to pay for the stock, he must look to Larimer to make good his pledge. It is no defence to this action for the instalments which, by the very terms of the subscription, he agreed, and became liable, to pay.

[Robinson *v.* The Pittsburgh and Connellsville Railroad Company.]

"But the defendant's counsel further contend, that the stock subscribed by the defendant was afterwards taken by the company from General Larimer, as his own, by virtue of a previous purchase from the defendant, and that the contract of subscription, if not the stock itself, was thereby extinguished, and no recovery can be had thereon by the company against the defendant. If the defendant, after he made the subscription, sold the stock to Larimer, and if the company took the same from Larimer, that might amount to an extinguishment of the contract of subscription, and constitute a good defence to this action. But is there any evidence of such a sale and transfer as is here alleged? Aside from the written memorandum at the foot of the printed contract of subscription, to which we shall hereafter advert, there is not a particle of evidence that the defendant sold, or in any way transferred this stock to Lorimer, or that the latter transferred or undertook to transfer the same to the company. The certificate of Larimer given in evidence by the defendant, tends *to rebut the supposition* of any such sale or transfer. If such were the fact, why is it not so stated by Larimer? The fact of such a sale and transfer could have been readily shown. But there is no evidence, either that the defendant sold the stock to Larimer, or that Larimer transferred the same to the company, unless it is furnished by the memorandum in writing at the foot of the printed subscription, which is in these words: 'This stock is taken from William Larimer, Jr., individually, at the same rates sold to him.' What is the meaning of this language? What was intended by this memorandum? Looking at the memorandum itself in connection with the terms of the printed subscription, it might be difficult, if not impossible, to determine precisely what construction should be given to it. It is ambiguous, if not unintelligible. But with the light thrown upon it by the other evidence, we may possibly be able to discover its meaning. But does it mean what the defendant's counsel contend that it does? Is it an admission by the company that the stock there subscribed had been sold to Larimer, and that the company had taken it from Larimer, at the same rates at which it was sold to him? It is clear that if the memorandum was made *before* the defendant, and those whose names follow his, made their subscriptions, it was not intended for any such purpose, and cannot possibly be construed into an admission that the stock so subscribed had been sold to Larimer and transferred to the company. There is no evidence tending to show that the memorandum was made *after* the subscriptions. What, then, is the presumption? Is it that it was made *after* the subscriptions? I cannot say that any such presumption arises, either from the law or the facts of this case; and if such were the legal presumption, it would, as it seems to me, be rebutted by the testimony of Veeder, who states that he saw the memorandum as early as August 1853, when he

came into the service of the company, and that most of the other subscribers whose names are below the defendant's have paid the instalments called for on their subscriptions. If Veeder is believed, and he is not contradicted or impeached, the memorandum could not have reference to the stock which Larimer transferred to the company on the 5th of January 1855, in pursuance of the resolution of the directors of the 3d of December 1853, because the memorandum was made before either the passage of the resolution or the transfer of the stock.

"Besides, the resolution of the 2d of December 1853 recites the purchase of a specific number of shares of stock by Larimer for the company from the original stockholders; and the plaintiffs have shown by the transfer-book of the company, that between the 14th of February 1848, and the 1st of October 1852, a large amount of stock was transferred to Larimer by the original subscribers; which is undoubtedly the stock referred to by the resolution of the 3d of December 1853, as shown by the stock-book of the company, in which Larimer is credited with the amounts purchased by and transferred to him, and charged with the amount transferred to the company. This stock, as the resolution of the 3d of December 1853 shows, was purchased by Larimer of the original stockholders for the company. The testimony of Veeder shows that the sum of $2.50 on each share so purchased by Larimer, had been paid by the original subscribers, and that Larimer paid them therefor, either out of his own funds or the funds of the company, the sum of $1.43 for each share so purchased. He had purchased, as the evidence shows, this stock for the company, before the defendant made his subscription, and at the date of defendant's subscription it was still standing in his name, but having been purchased for, it was the company's stock. It was doubtless a part of this stock so held by the company for which the defendant subscribed, and it was doubtless the purpose of the memorandum to indicate this fact, and that the defendant was to have it subject to the payment of all future instalments at the rate at which it had been purchased by Larimer. That is to say, the company having already received the first instalment of $2.50 per share, less $1.43 paid therefor, the defendant was to be credited with the difference, $1.07 on each share, and this they are now willing and offer to allow. The evidence shows that the defendant was one of the original subscribers, and that he had transferred to Larimer the stock so subscribed, sometime before he made the subscription in question. But whether this be the meaning of the written memorandum or not, it is clear that it was not intended to show that the stock subscribed for by the defendant had been purchased by Larimer and transferred to the company. For there is not a particle of evidence to show that the defendant ever sold the stock to Larimer, or that Larimer ever

[Robinson *v.* The Pittsburgh and Connellsville Railroad Company.]

transferred it to the company.   No such sale or transfer is shown by the books of the company or by any other evidence, and I cannot, therefore, submit it as a question of fact for the jury to determine whether the stock sued for here was or was not a part of the stock purchased by General Larimer, and by him transferred to the company.   The plaintiffs' evidence shows that the stock transferred to the company by General Larimer was purchased by him, before the defendant's subscription was made, and could not include the defendant's subscription now in controversy.

"But suppose the presumption and the fact to be that the written memorandum was made after the date of defendant's subscription, is it such a material alteration of the contract or agreement of subscription as will avoid it and prevent the plaintiffs from recovery thereon?   Without the written memorandum in question, the plaintiffs' right to recover would be clear and unquestionable. The subscription is absolute and unqualified in its terms, and being made to the company after the granting of the letters patent and the organization of the company, it was not necessary to aver or prove that the first instalment mentioned in the act was paid at the time the subscription was made: 4 *Casey* 318.   It seems to me, that the memorandum does not materially vary the terms of the agreement.   It imposes no increased obligation on the defendant, nor does it require the payment of a larger amount than would be otherwise required of him.   It seems to me, that in no view that can be taken of the matter, can the defendant avail himself of the written memorandum to defeat the plaintiffs' action; and I therefore instruct the jury that the defendant has failed to make out a defence to their action.   The plaintiffs offer to allow the defendant a credit of $1.07 on each share, and your verdict should be for the residue, with interest."

To this charge the defendant excepted; and a verdict and judgment having been rendered for the plaintiffs for $5960.48, the defendant removed the cause to this court, and here assigned the same for error.

*Williams & Sproul,* for the plaintiff in error.

*Hamilton* and *Sewell,* for the defendant in error.

The opinion of the court was delivered by

WOODWARD, J.—The assignments of error are all founded on the charge of the court, and are supported by such verbal criticisms as are easy to be made; but which amount to nothing when they overlook the plain purport, intent, and drift of the language used.   In looking through the charge of the learned judge, we think it was more favourable to the defendant than it should have been.

[Robinson v. The Pittsburgh and Connellsville Railroad Company.]

For instance, he puts the answer to the first ground of defence on the incapacity of parol evidence to control the written subscription, whereas he might have set aside that branch of the defence on the ground of fraud also.

If the defendant's subscription was made for the purposes explained in Larimer's certificate, it was, whether so intended or not, a fraud on the company, and on all subsequent subscribers, the legal consequence of which would be, that while the defendant might not reap any advantage from it, he would be held to all the responsibilities of a bonâ fide subscriber: Angell & Ames on Corporations, p. 146, and the cases there cited. I refer also to what was said on this point in Graff's Executrix v. The Pittsburgh and Steubenville Railroad Company, 7 Casey 489.

The court did not deprive the defendant of the benefit of his position, that Larimer had taken this stock off his hands, and transferred it to the company, and so extinguished it; but the difficulty was that the jury did not believe it. They applied the written memorandum at the foot of the subscription to the stock transferred in 1848, among which were 107 shares in the name of the defendant; and hence, the memorandum had no other effect upon the subscription of 1853 than to entitle the subscribers to a credit on each share of $1.07. This balance resulted from their former payments of $2.50 on each of the transferred shares, for which they had received from Larimer $1.43 a share, leaving them out of pocket $1.07 a share—the amount which was to be credited on the new subscription.

We apprehend that this was a very sound conclusion from all the evidence in the case, and we conceive that the defendant has no reason to complain of it.

In the absence of all explanatory proof as to the time when the memorandum was added to the formal subscription, the legal presumption would be that it was there when the subscription was made. And the evidence of Veeder fixed it there as early as August 1853.

Referring to the jury the only hypothesis which the evidence seemed to justify as to the time and application of this memorandum, the court declined to submit the question whether the stock sued for here was or was not part of the stock purchased by General Larimer, and by him transferred to the company.

And they were quite right in this, for there was no evidence to raise such a question. On the contrary, the evidence was that the stock which Larimer transferred to the company was purchased by him prior to the time of the defendant's subscription. And of a purchase and transfer, subsequent to the subscription sued on, there was not a tittle of evidence. It is labour lost, then, to attempt to torture from such evidence the favourite defence relied on here.

[Robinson *v.* The Pittsburgh and Connellsville Railroad Company.]

The court might have dealt with it more summarily than they did; but it is no just ground of complaint that it received more attention than it deserved.

The judgment is affirmed.